IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :          CRIMINAL ACTION
                                  :
            v.                    :
                                  :
PHILLIP MILES                     :          NO. 10-279-2


MEMORANDUM

Bartle, C.J.                                      July 29, 2010

          Before the court is the motion of defendant Phillip

Miles to suppress physical evidence and oral statements pursuant

to the Fourth Amendment.  Miles is charged with bank fraud and

conspiracy to commit bank fraud and possession of counterfeit

securities.  See 18 U.S.C. § 1344; 18 U.S.C. § 513(a).

          The court held an evidentiary hearing to determine

whether the Fourth Amendment rights of Miles were violated.  At

the hearing, the government presented testimony from Philadelphia

Police Officers Damon Linder and Edwin Vaughn, and Philadelphia

Police Detective Timothy Connell.  Linder and Vaughn arrested

Miles, and Connell later interrogated him at the police station

at 55th and Pine Streets.

          The testimony presented at the hearing establishes

that, on August 16, 2006, David Anderson was driving a car near

the intersection of 63rd and Master Streets in West Philadelphia.

Michael Easton was a passenger in the front seat of the vehicle,

while Michael Corbin sat next to Miles in the rear.  A black

briefcase rested on the seat between them.  Linder and Vaughn, in

uniform and in a marked police car, conducted a traffic stop of the vehicle after noticing that the center brake light was not working.

The officers asked the driver and each of the passengers for their names and identifying information. After the officers checked the information provided through their police "NCIC" computer, they learned that Miles and Easton had provided them with false identities.[1] When Miles and Easton subsequently furnished their real names, the police officers discovered through the police "NCIC" computer that these two passengers, as well as Corbin, had outstanding warrants for their arrests unrelated to anything observed before or during the traffic stop. Linder and Vaughn could not recall the exact nature of the warrants but believed that they were all either for failure to appear in court or for scofflaw traffic violations.

The police officers had Miles, Corbin, and Easton exit the car and placed them under arrest. Anderson was permitted to remain where he was. The officers briefly searched the three incident to their arrests, handcuffed them, and moved them away from the vehicle. During this search, Linder removed from Miles' person a keyring with two "jump drives" on it. Jump drives, also known as thumb drives or flash drives, are portable computer data storage devices. Neither Linder nor Vaughn was able to recall

_____

1. "NCIC" stands for the National Crime Information Center. These police computers allow police officers to access criminal information about an individual from across the nation by entering that person's name.

whether Miles, Corbin, and Easton were immediately placed in their patrol car or merely moved to the rear of the vehicle which Anderson had been driving.

In any event, after the arrestees were secured, Linder removed the black briefcase from the vehicle, at which time Miles identified it as his. Linder then took the briefcase to the rear of his police car and searched it. He testified that this type of search was standard police practice at the time and that he conducted it in order to make sure that there were no weapons or other contraband inside. New York v. Betton, 453 U.S. 454 (1981).

Upon searching Miles' briefcase, Linder discovered an envelope, which contained multiple checks from LaborReady, a day labor company. The checks were made out to various persons in the same denomination. He also found papers printed with images of United States currency, including several papers printed with only half of the bill on it. Thereafter, Linder placed the briefcase in his patrol car.

Linder issued a verbal warning to Anderson to have the center brake light of the car repaired. Anderson was permitted to drive away. Linder and Vaughn then proceeded to take Easton, Miles, and Corbin to the police station at 55th and Pine Streets.

Once at that location, Miles was searched and taken to a holding cell. Under Philadelphia Police Directive 82, all arrestees must be searched after arrival at the police station, prior to being placed in a holding cell. During the search,

police are looking for any contraband or any weapons that arrestees could use to harm themselves or others.  They are also required to remove any extra clothing, jackets, belts, and shoelaces.

The Philadelphia Police Department has in effect a policy found in Memorandum (99-14) for treatment of all luggage, including suitcases, briefcases, and footlockers, belonging to arrestees.  According to this Memorandum, if the police have no reasonable suspicion that the luggage contains evidence of a crime, an inventory search of the item is conducted in the presence of the owner.  This search is done to remove any weapons or contraband and to identify any valuables or other property belonging to the arrested individual so as to prevent theft or police liability.  The owner of the luggage is then given a property receipt for its contents, which he can reclaim upon his release.  If the police have reasonable suspicion that the luggage contains evidence of a crime, it is held but not opened until a search warrant is obtained.  Only then is a search made.

Once Miles was in the holding cell, Linder contacted Detective Connell and searched Miles' briefcase in Connell's, but not Miles', presence.  This search again revealed the LaborReady checks and the printed currency.  To Linder and Connell, the LaborReady checks appeared to be counterfeit.  They believed that Miles was attempting to counterfeit currency.

Not long thereafter, a police officer alerted Connell that Miles wanted to talk to him about the contents of his

briefcase.  Connell had Miles brought from the holding cell into an interrogation room at approximately 2:30 p.m.  Connell read Miles his Miranda rights and had Miles sign and initial a standard police department form acknowledging those rights and his waiver of them.  See Miranda v. Arizona, 384 U.S. 436 (1966).  The government produced the signed form as evidence.  Miles clearly confirmed that he understood his rights and did not want to remain silent or to speak to a lawyer.

During the interview, Miles made a number of statements regarding his attempts to obtain images of the checks and currency and to reproduce them with the help of co-defendant Kevin Strickland for the purposes of committing bank fraud.  During this interview, Connell contacted the Treasury Department.  The interview lasted several hours and was punctuated by breaks and a drive by the police with Miles to observe Strickland's house.  On the basis of the statements made by Miles in the interview, a warrant was obtained to search Miles' jump drives, on which they later discovered more images of checks and currency.

Miles argues that the contents of the briefcase and his statements to Connell during interrogation should be suppressed.  He first contends that the initial traffic stop was unreasonable because the brake lights were working.  Second, he asserts that the search of his briefcase was wrongly conducted without a warrant.  Finally, he maintains that his statements to police

should be suppressed because they were given without his being told about his Miranda rights.  See id.

The Fourth Amendment provides that, "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated."  U.S. Const. amend. IV.  Although stopping a vehicle and its occupants qualifies as a seizure under the Constitution, "a traffic stop will be deemed a reasonable seizure when an objective view of the facts shows that an officer possessed specific, articulable facts that an individual was violating a [correclty interpreted] traffic law at the time of the stop." U.S. v. Delfin-Colina, 464 F.3d 392, 398 (3d Cir. 2006).  We find that the police officers stopped Anderson's vehicle for a non-functioning center brake light.  An inoperative light is a violation of the Pennsylvania Motor Vehicle Code.  See 75 Pa. Cons. Stat. § 4303.  The traffic stop of Anderson's car with Miles inside was reasonable under the Fourth Amendment.

Miles further contends that, even if the traffic stop was reasonable, the officer's search of his briefcase was not. In Arizona v. Gant, the Supreme Court clarified its earlier decision in New York v. Betton so as to limit searches incident to the arrest of automobile passengers.  See 129 S. Ct. 1710 (2009).  The Court stated:

> Police may search incident to arrest only the space within an arrestee's 'immediate control,' meaning the area from within which he might gain possession of a weapon or destructible evidence. ... [The Fourth Amendment] does not authorize a vehicle

-6-

search incident to a recent occupant's arrest
after the arrestee has been secured and
cannot access the interior of the vehicle.
Circumstances unique to the automobile
context justify a search incident to arrest
when it is reasonable to believe that
evidence of the offense of arrest might be
found in the vehicle.

Id. at 1714. The government does not contest that Miles was

secured and could not access the interior of Anderson's car at

the time Linder retrieved his briefcase and searched it. The

government also concedes that there was no reason to believe that

the car's interior would yield evidence of the offense for which

Miles was being arrested.[2]

However, the government maintains that the court should

not suppress this evidence because it would have been inevitably

discovered even in the absence of the improper search. The

Supreme Court has held that the exclusionary rule does not

require suppression of evidence obtained in violation of the

Fourth Amendment if the police would have inevitably uncovered it

through lawful means. See Nix v. Williams, 467 U.S. 431 (1984).

As our Court of Appeals has stated, "It is the government's

burden to show that the evidence at issue would have been

acquired through lawful means, a burden that can be met if the

government establishes that the police, following routine

procedures, would inevitably have uncovered the evidence." U.S.

v. Vasquez de Reyes, 149 F.3d 192, 195 (3d Cir. 1998). The

_____

2. We assume, without conceding, that Arizona v. Gant is
applicable to a case such as this which was still pending when it
was handed down. Compare U.S. v. Davis, 598 F.3d 1259 (11th Cir.
2010), with U.S. v. Gonzalez, 578 F.3d 1130 (9th Cir. 2009).

Supreme Court has explained that "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings." Nix, 467 U.S. at 444.

We credit the testimony of Linder that the Philadelphia Police Department had in place regular procedures that would have provided for the eventual search of Miles' possessions. In this case, the officers had no reason to believe that the briefcase contained any evidence of a crime. Under the circumstances, the police department regulations required that the police conduct an inventory search in order to discover any contraband or weapons and to document for Miles any valuables to protect the Police Department against liability for its contents should Miles later allege that an item was missing. Such inventory searches are constitutional. See Illinois v. Lafayette, 462 U.S. 640, 646 (1983).

It is undisputed that, at the time of Miles' arrest, it was the routine policy and practice of the Philadelphia Police Department to search at the police station all luggage accompanying an arrestee. Had the police officers abstained from searching Miles' briefcase on the scene, they would have inevitably discovered its contents at the police station at 55th

and Pine Streets.  We will deny Miles' motion to suppress the contents of his briefcase.[3]

Miles finally argues that he was not informed about his rights under Miranda v. Arizona prior to custodial interrogation by Detective Connell.  See 384 U.S. 436 (1966).  He contends that the court should suppress any statements made during that interrogation.  We credit Connell's testimony that he did read Miles his Miranda rights prior to asking him any questions and that Miles waived those rights.  The government has come forward with a written acknowledgment of Miranda rights form signed by Miles on which he noted that he did not wish to remain silent or to speak to a lawyer.  Miles has not produced any evidence to the contrary.  He understood and waived his rights under Miranda v. Arizona.  Therefore, we will deny his motion to suppress statements made to the police detective during custodial interrogation.

---

3.  The fact that Miles was not present when the briefcase was searched at the police station is not important for the issue presented.  The question is simply whether the contents would inevitably have been discovered under the established Police Department policy.  The answer is in the affirmative.